OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 The primary issue on appeal is whether the collateral estoppel doctrine was properly applied to deprive defendant of a pretrial
 
 Huntley
 
 hearing. We agree with defendant that he should not have been collaterally estopped from litigating the admissibility of his statements, and thus remit for a
 
 Huntley
 
 hearing. We disagree, however, with defendant’s further contention that his right to be present at trial was abridged when the trial court, with counsel present, spoke with a sworn juror immediately prior to deliberations. Accordingly, a new trial is unnecessary at this time.
 

 I.
 

 By his own admissions — allegedly involuntary — defendant in August 1981 killed a man in the Bronx, and in a separate incident a few days later killed a woman in Manhattan. The present appeal relates to defendant’s conviction for the Manhattan homicide.
 

 The evidence adduced at a
 
 Huntley
 
 hearing in the Bronx case, which proceeded first, revealed that on February 16, 1982, around noon, defendant was arrested and placed in a holding cell in a Bronx station house. A series of interrogations over the next 20 hours led to defendant’s confessions to the murders. The first substantive interview did not commence until 10:00 p.m., when a bilingual officer, Detective Andrew Lugo, arrived at the station house.
 

 After Lugo advised defendant of his
 
 Miranda
 
 rights in Spanish, this initial interrogation, which lasted about two hours, proceeded in two stages. Through Lugo, defendant was first questioned about the Bronx killing by Detective Thomas Mullane, who took notes. Lugo read Mullane’s notes to defendant in Spanish, and after stating that he understood, defendant signed the notes. Again through Lugo, defendant was then questioned by Detective Joseph Montuori, a Manhattan detective, about the woman’s death. A separate statement regarding the Manhattan incident was reduced to writing and
 
 *27
 
 signed by defendant. Defendant was returned to his cell around midnight and given a sandwich and soda.
 

 A Manhattan Assistant District Attorney (ADA) reported to the Bronx precinct and, commencing at 4:22 a.m. on February 17, conducted a videotaped confession, through a different translator, to the Manhattan murder. Present as observers during the videotape were Montuori and a Bronx ADA. After about a half-hour defendant twice stated that he did not want to continue and the interrogation ceased. Defendant then napped in his cell for about two hours and, upon awakening, was given a roll and coffee.
 

 The final interview, also videotaped, began a few minutes before 7:00 a.m. and concerned the Bronx homicide. This interrogation was conducted by the Bronx ADA in the presence of Mullane.
 

 Defendant was separately indicted for second degree murder and other charges in New York and Bronx Counties. In the Bronx case, the People served a CPL 710.30 notice listing the written and videotaped statements concerning the Bronx murder, and defendant in turn moved to suppress those statements. Accordingly, a
 
 Huntley
 
 hearing was held in Supreme Court, Bronx County. Two witnesses, Lugo and Mullane, testified. They were not asked any questions relating to Montuori’s interrogation, and neither the Manhattan statement nor the Manhattan videotape was offered into evidence, although the court viewed the videotape.
 

 At the hearing’s conclusion, defense counsel offered essentially two arguments for suppression. He argued that defendant invoked his right to remain silent at the end of the Manhattan videotape, and thus the People did not "scrupulously” honor that right when they subjected defendant to the subsequent Bronx videotape
 
 (compare, Michigan v Mosley, 423
 
 US 96). Counsel also argued that the statements were involuntary under all the circumstances, including the long delay between arrest and the first interrogation 10 hours later, incommunicado confinement in close quarters for an extensive period, and lack of sleep, food and bathroom privileges. In passing, counsel additionally suggested that the
 
 Miranda
 
 warnings on the Bronx videotape were deficient, using the Manhattan tape as a model of proper warnings.
 

 The prosecutor disputed these contentions, arguing that defendant’s election to remain silent at the end of the Manhattan tape did not apply to the Bronx tape because "[i]t was
 
 *28
 
 a different D.A., different case, different jurisdiction, totally separate.” The prosecutor additionally noted that defendant was treated fairly and that his statements were made knowingly and voluntarily. Ruling from the bench, the court denied defendant’s suppression motion, concluding that the police procedures were "legally and properly conducted”; defendant was advised of his rights on a number of occasions and knowingly and voluntarily waived them; and "[t]here has been no other evidence introduced which would indicate that there was any coercion or involuntariness on the part of this defendant.”
 

 Later in 1982 defendant was tried and convicted in Supreme Court, Bronx County, for the Bronx murder. That conviction was affirmed by the Appellate Division in 1991
 
 (People v Aguilera,
 
 172 AD2d 234) and a Judge of this Court denied leave to appeal (78 NY2d 1073).
 

 The Manhattan case was brought to trial in New York County in 1984. Prior to trial, defendant requested a
 
 Huntley
 
 hearing "to determine the constitutionality of the procedures used in connection with the * * * statements allegedly made.” The People opposed defendant’s motion on the ground that he was collaterally estopped by the ruling on his Bronx suppression motion. Agreeing with the People, the motion court ruled that "defendant had the full opportunity to litigate the constitutionality of his statements which includes the statements that the People are going to offer at trial here. The suppression court in Bronx County denied the motion to suppress the defendant’s statements and that ruling is binding upon the defendant.”
 

 When defendant sought reconsideration before the Trial Justice, the court directed him to reargue before the motion court, which adhered to its original ruling. Hence, defendant went to trial in Manhattan without a
 
 Huntley
 
 hearing. Defendant took the stand in his defense and sought to have the jury reject the confessions as coerced
 
 (see,
 
 CPL 710.70 [3];
 
 see generally,
 
 Sobel,
 
 The "Second-Bite” Role of the Jury in the Admissibility of Confessions in New York,
 
 48 Brooklyn L Rev 1 [1981]). The jury deadlocked, reporting in a note that three of its members "have rejected the written and video statements as evidence,” and a mistrial was declared.
 

 Defendant’s retrial was held in 1985. Defendant again testified, alleging that he was periodically beaten by the police in the station house and forced, on three occasions, to take cold
 
 *29
 
 showers while fully clothed. Defendant additionally testified that Lugo provided him with a statement written in Spanish —ordering him to memorize it — and struck him on the head with a bat, poked him with a stick, and repeatedly slapped him in the face. According to defendant, the statement made on the Manhattan videotape was not true but was merely a repetition of the statement the detectives forced him to memorize. Defendant acknowledged that he signed the written statement, but claimed that he did not understand English.
 

 Immediately prior to deliberations, a juror, in the presence of the Judge and both counsel, expressed anxiety about her health and having to deliberate late into the night. She declined, however, the Judge’s offer to be excused, explaining that she felt "better just talking among ourselves.” Neither counsel objected to the juror’s continued service, nor did defendant or his counsel object to defendant’s absence from the conference. After brief deliberations, the jury reached a guilty verdict.
 

 On appeal from that conviction, defendant argued that collateral estoppel was erroneously applied to deny him a
 
 Huntley
 
 hearing in Manhattan, but the Appellate Division disagreed and affirmed (185 AD2d 772). We now modify and remit for a hearing.
 

 II.
 

 Collateral estoppel, or "issue preclusion”
 
 (People ex rel. Dowdy v Smith,
 
 48 NY2d 477), is a common-law doctrine rooted in civil litigation that, when applied, prevents a party from relitigating an issue decided against it in a prior proceeding
 
 (People v Goodman,
 
 69 NY2d 32, 37;
 
 Matter of McGrath v Gold,
 
 36 NY2d 406, 411;
 
 Schwartz v Public Adm’r of County of Bronx,
 
 24 NY2d 65, 69). While the principle applies in criminal cases as well
 
 (see, e.g., People v Sailor,
 
 65 NY2d 224, 228,
 
 cert denied
 
 474 US 982;
 
 People v Berkowitz,
 
 50 NY2d 333, 344), in the criminal context "it cannot be applied in quite the same way as in civil cases”
 
 (People v Plevy, 52
 
 NY2d 58, 65;
 
 see, People v Reisman,
 
 29 NY2d 278, 285,
 
 cert denied
 
 405 US 1041). We have actually employed the doctrine only once in a criminal case — to preclude the People from relitigating the fact of defendant’s alleged presence at a crime scene
 
 (People v Acevedo,
 
 69 NY2d 478).
 

 As collateral estoppel has evolved in our criminal jurisprudence, the formal prerequisites are identity of parties; identity
 
 *30
 
 of issues; a final and valid prior judgment; and a full and fair opportunity to litigate the prior determination
 
 (People v Goodman,
 
 69 NY2d 32, 38 [collecting cases]). These factors, however, are not to be applied "mechanically” because "countervailing policies * * * may at times outweigh the otherwise sound reasons for preventing repetitive litigation to the greatest extent possible”
 
 (People v Berkowitz,
 
 50 NY2d, at 344;
 
 see also, People v Acevedo,
 
 69 NY2d, at 485 ["for policy reasons collateral estoppel is not as liberally applied in criminal prosecutions as in civil actions”];
 
 People v Fagan,
 
 66 NY2d 815, 816).
 

 Underlying the collateral estoppel doctrine is a desire to conserve the time and resources of the court and the parties, and to avoid possible inconsistent determinations
 
 (Hoag v New Jersey,
 
 356 US 464, 470;
 
 People v Acevedo,
 
 69 NY2d, at 485;
 
 People v Plevy, 52
 
 NY2d, at 64). The doctrine also assuages the "long-recognized equitable reaction” against allowing a party to relitigate issues already decided adversely to it
 
 (People v Lo Cicero,
 
 14 NY2d 374, 380). Thus, in civil actions, where the primary societal interest is in the peaceful, expeditious and impartial settlement of disputes, we might accept even an occasional erroneous result as preclusive to serve other significant societal interests
 
 (see, People v Berkowitz,
 
 50 NY2d, at 345).
 

 By contrast, in criminal prosecutions, where defendant’s liberty interest is at stake, the preeminent concern is to reach the correct result
 
 (People v Goodman,
 
 69 NY2d, at 37;
 
 People v Sailor, 65
 
 NY2d, at 228), and hence the policies underlying issue preclusion are different. For this reason we have been generally less receptive to estoppel in criminal cases
 
 (see, e.g., People v Sailor,
 
 65 NY2d, at 228-229 [prosecution not estopped by prior persistent felony offender proceeding];
 
 People v Plevy, 52
 
 NY2d 58 [collateral estoppel erroneously applied to deprive defendant of suppression hearing];
 
 People v Berkowitz,
 
 50 NY2d 333 [defendant could not estop prosecution based on codefendant’s acquittal];
 
 People v Reisman,
 
 29 NY2d 278 [People not estopped by result in out-of-State suppression hearing];
 
 People v Lo Cicero,
 
 14 NY2d 374 [People not es-topped by Federal prosecution]).
 

 Historically, courts have tended to favor defendants in the application of collateral estoppel because of concerns for due process, double jeopardy, the right to a jury trial, fundamental fairness and preventing undue harassment
 
 (see, e.g, Ashe v
 
 
 *31
 

 Swenson,
 
 397 US 436 [principles of double jeopardy mandate collateral estoppel against the State under the circumstances];
 
 People v Goodman,
 
 69 NY2d, at 38 [noting that collateral estoppel is used to "prevent the harassment of defendants”];
 
 People v Acevedo,
 
 69 NY2d, at 485 [citing "fairness to the defendant” as a principle underlying collateral estoppel]). Indeed, it has been argued that issue preclusion should never be employed against a criminal defendant at any stage of the case
 
 (see, People v Plevy,
 
 52 NY2d, at 60-61;
 
 but see, People v Owens,
 
 102 Ill 2d 145, 151-152, 464 NE2d 252, 255 [estopping defendant],
 
 cert denied
 
 469 US 963; Comment,
 
 The Use of Collateral Estoppel Against the Accused,
 
 69 Colum L Rev 515, 523 [1969] [concluding that "an absolute prohibition on the use of collateral estoppel against the accused seems unjustified”]), a question we did not resolve in
 
 Plevy
 
 and do not reach today, inasmuch as we find the doctrine inapplicable here in any event.
 

 III.
 

 Applying these principles to the present appeal, we first address defendant’s contention that collateral estoppel could not apply to the Bronx
 
 Huntley
 
 determination because it was not a final judgment, as a defendant may always relitigate the issue of voluntariness before the jury (CPL 710.70 [3];
 
 compare, Matter of McGrath v Gold,
 
 36 NY2d, at 412 [finality lacking in dismissal of indictment, in part because suppression order was interlocutory]). Here, however, upon defendant’s conviction in the Bronx — which predated the use of collateral estoppel against him in Manhattan — the
 
 Huntley
 
 ruling obtained the requisite finality
 
 (see, People v Plevy,
 
 52 NY2d, at 64).
 
 *
 
 Accordingly, lack of finality was no bar to collateral estoppel here.
 

 As to identity of issues, however, we agree with defendant that application of collateral estoppel to bar consideration of all possible
 
 Huntley
 
 issues in Manhattan swept too broadly. The Bronx CPL 710.30 notice was limited to the Bronx written and videotaped statements, and thus did not inform defendant that the Manhattan statements were also at issue. Indeed, it is evident from the record that neither side focused on the Manhattan statements. For example, no one
 
 *32
 
 present when the Manhattan tape was made testified; Detective Montuori, who questioned defendant about the Manhattan slaying and whose notes defendant signed, was not a witness; nor was the Montuori interrogation explored with the two witnesses who did testify. Moreover, there was no testimony relating to the circumstances under which defendant signed Montuori’s notes, or even that the notes were translated. In fact, the Manhattan written statement was not admitted into evidence. Also significant is that defense counsel suggested that the
 
 Miranda
 
 warnings on the Manhattan tape were entirely proper in contrast to the Bronx tape, an argument that likely would not have been made had the Manhattan statements themselves been at issue.
 

 Defendant’s Manhattan motion sought a hearing "to determine the constitutionality of the procedures used in connection with the * * * statements allegedly made,” which is broad enough to cover a variety of issues relating to the Manhattan statements not considered in the Bronx hearing, including
 
 Miranda.
 
 Thus, defendant is entitled to a
 
 Huntley
 
 hearing to litigate his contentions that the Manhattan statements should be suppressed.
 

 Having decided that defendant is entitled to a
 
 Huntley
 
 hearing, we must consider whether defendant will be permitted to relitigate one claim for which there was issue identity— whether defendant’s statements were the product of coercion. When he argued that an over-all coercive atmosphere led to his confessions to the Bronx murder, defendant necessarily put in issue the alleged coercion surrounding the Manhattan statements. It is plain, therefore, that there was issue identity insofar as coercion is alleged.
 

 Our determination that collateral estoppel should not apply turns on the requirement that the party opposing estoppel must have had a "full and fair opportunity” to litigate the prior result
 
 (see, People v Goodman,
 
 69 NY2d, at 38). In
 
 People v Plevy
 
 (52 NY2d, at 65) we recognized that defendant’s testimony at a suppression hearing is important proof that may well alter the result, especially when police testimony is not otherwise contradicted. We observed, moreover, that it was not dispositive that defendant "could have testified at the first suppression hearing, and thus had the opportunity to fully litigate the issue at that time, in the sense that he had a legal right to do so”
 
 (id.,
 
 at 65). Instead, the court "must also consider the 'realities of the [prior]
 
 *33
 
 litigation’, including the context and other circumstances which, although not legal impediments, may have had the practical effect of discouraging or deterring a party from fully litigating the determination which is now asserted against him”
 
 (id.,
 
 at 65; citations omitted).
 

 Plevy
 
 is in many respects similar to the present case. Defendant was indicted for murder in Kings County and burglary in Nassau County. An issue common to defendant’s suppression motions in both cases was whether he consented to police entry into his home. Defendant did not testify at the Kings County suppression hearing, and the court determined the consent issue adverse to defendant. Defendant was thereafter foreclosed from relitigating the issue in the burglary case, despite offering to testify on the issue. In holding that defendant was erroneously estopped, we noted: "Constitutionally the accused has the right to testify or not to testify at any criminal action or proceeding. The doctrine of collateral estoppel cannot be said to be superior to those rights, particularly when it operates to preclude the court from considering evidence which was not available to the court at the prior proceeding, and which if considered here would have involved a minimal expenditure of time in a hearing already under way.”
 
 (People v Plevy,
 
 52 NY2d, at 66.)
 

 As in
 
 Plevy,
 
 we conclude that defendant did not have a full and fair opportunity to litigate for purposes of collateral estoppel. Aside from the fear of disclosing one’s case at the outset and the possibility that hearing testimony will be used against defendant at trial
 
 (see, People v Plevy, 52
 
 NY2d, at 66), in the present case defendant might have been deterred from testifying in the Bronx because he had an argument for suppression that did not depend on his testimony: at the conclusion of the Manhattan videotape, he invoked his right to remain silent, which he claimed attached to the subsequent Bronx videotape.
 

 Permitting defendant to relitigate the coercion issue by offering his own testimony will involve a "minimal expenditure of time in a hearing already under way”
 
 (People v Plevy, 52
 
 NY2d, at 66), and thus there is no question that collateral estoppel should give way on the coercion issue. Indeed, after defendant’s testimony on the point at the first Manhattan trial the jury deadlocked when threé jurors refused to consider the statements as evidence.
 

 
 *34
 
 IV.
 

 As a basis for a new trial, defendant contends that his right to be present at all material stages of trial was violated when the trial court, with counsel present, spoke with a sworn juror just prior to deliberations. That contention is wholly meritless. Inasmuch as defendant was not excluded from a core segment of trial, reversal is mandated only if defendant’s absence might have had an effect on the opportunity to defend
 
 (see, People v Morales,
 
 80 NY2d 450, 456), which has not been established on this record
 
 (see, People v Torres,
 
 80 NY2d 944, 945;
 
 People v Mullen,
 
 44 NY2d 1, 5-6;
 
 see also, People v Darby,
 
 75 NY2d 449, 453). Moreover, although defendant argues that had he been present, he could have evaluated the juror to determine for himself whether to object to her continued service
 
 (compare, People v Antommarchi,
 
 80 NY2d 247 [presence right at jury selection]), at that stage of trial the decision to move for the juror’s disqualification was necessarily delegated to counsel
 
 (see, People v Rosen,
 
 81 NY2d 237, 244), who chose not to object.
 

 V.
 

 Thus, the case should be remitted to Supreme Court, New York County, for a hearing in connection with defendant’s motion to suppress statements. If, after that hearing, the court concludes that suppression is appropriate, further proceedings, including a new trial, should be had as the circumstances may warrant. If the court concludes that suppression is not appropriate, the judgment should be amended to reflect that result.
 

 Accordingly, the order of the Appellate Division should be modified by remitting to Supreme Court, New York County, for further proceedings in accordance with this opinion and, as so modified, affirmed.
 

 Judges Simons, Titone, Hancock, Jr., Bellacosa and Smith concur; Judge Levine taking no part.
 

 Order modified and case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.
 

 *
 

 Defendant does not urge that the judgment lacks finality because it had yet to be reviewed on appeal
 
 (see generally,
 
 Annotation,
 
 Judgment
 
 As
 
 Res Judicata Pending Appeal,
 
 9 ALR2d 984;
 
 compare, Parkhurst v Berdell,
 
 110 NY 386, 392), and thus we express no view on the issue.